IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **BRAZIE JAMES BROWN,** | ) | Case No. 24-02062-TOM-7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **PENNYMAC LOAN SERVICES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 24-00045-TOM |
| vs. | ) | |
| | ) | |
| **BRAZIE JAMES BROWN,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This adversary proceeding came before the Court for trial on December 9, 2025. Appearing before the Court were Andrew Saag, counsel for Plaintiff PennyMac Loan Services, LLC, and Stephanie Cejas, witness for PennyMac Loan Services, LLC. The Defendant/Debtor, Brazie James Brown, did not appear and no appearances were made on his behalf. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I).[2] This Court has

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
    The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. §157(b)(2)(I) provides as follows:
    (b)(2) Core proceedings include, but are not limited to–
        (I) determinations as to the dischargeability of particular debts[.]
28 U.S.C. § 157(b)(2)(I).

considered the pleadings, arguments, the testimony of the Plaintiff's witness, and the law, and finds and concludes as follows.[3]

## FINDINGS OF FACT[4]

PennyMac Loan Services, LLC ("PennyMac") filed this adversary proceeding against Brazie James Brown (the "Debtor") asserting that a debt owed by the Debtor should be excepted from discharge pursuant to Bankruptcy Code § 523(a)(2)(A). PennyMac is the servicer for a loan obtained by the Debtor that is secured by a mortgage on real property located at 9321 Brake Circle, Kimberly, Alabama. The Debtor executed the mortgage along with Allene Gaines ("Ms. Gaines"), apparently his wife at the time,[5] on November 29, 2016. Ex. 1. On the same day the Debtor executed the mortgage he also signed the note in the amount of $212,711.00 secured by the mortgage; however, the note was not signed by Ms. Gaines. Ex. 2. According to the mortgage and note, the original lender was Mortgage Research Center, LLC d/b/a Veterans United Home Loans. Ms. Stephanie Cejas ("Ms. Cejas"), a supervisor in PennyMac's litigation service department, testified at the trial that the loan was assigned to PennyMac in November 2018. *See* Exs. 4, 5. Thereafter all communications with the Debtor were made by PennyMac and its representatives.

Ms. Cejas testified that on November 17, 2019, the Debtor's home suffered significant fire damage. The Debtor had a homeowner's insurance policy with Progressive that named PennyMac as loss payee, and a claim was made on that policy. At trial Ms. Cejas referred to provisions in the mortgage clearly reflecting that any insurance proceeds resulting from a loss or damage to the

---

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[5] The Mortgage identifies the "borrower" as Brazie J. Brown and Allene K. Gaines, Husband and Wife. Ex. 1. A printout dated November 24, 2025 from the Jefferson County Tax Assessor's website identifies the Debtor and Ms. Gaines as the owners of the property. Ex. 17.

2

home are due to be remitted to PennyMac; at that point PennyMac could hold the funds until any restoration or repairs to the property are completed to its satisfaction or, if the property will not be restored or repaired, PennyMac would apply the funds to the debt.

On July 23, 2020, Progressive issued a check in the amount of $267,285.30 payable to "Brazie Brown AND PennyMac Loan Services, LLC, ISAOA." Ex. 9. Progressive apparently sent the check to Debtor who endorsed it and presented it to USAA Federal Savings Bank for deposit on July 27, 2020, even though the check had not been endorsed by PennyMac. *See id.* USAA honored the check and thus the Debtor received the entire amount of insurance proceeds despite PennyMac being a joint payee on the check.

At the time the Debtor deposited the check, he was aware that it should have been sent to PennyMac. Ms. Cejas testified that in December of 2019, after the loss and before the check was issued, PennyMac informed the Debtor that upon receipt of proceeds he should endorse the check and mail it to PennyMac. In addition, Ms. Cejas testified that a letter dated August 13, 2020 was sent to the Debtor providing instructions for remitting the funds to PennyMac. *See* Ex. 8. Despite this, the Debtor never disclosed to PennyMac that he had deposited the check. In fact, according to Ms. Cejas's testimony, at some point the Debtor informed PennyMac that he did not want to rebuild his home on the same location, and on numerous occasions the Debtor represented that he would send the check to PennyMac. Despite these representations, the Debtor never sent the funds to PennyMac.

According to Ms. Cejas's testimony, the Debtor continued to make payments on the loan apparently until June 2023, which was not only after the fire but also after he received and kept the insurance proceeds. PennyMac has not received any additional funds from the Debtor since

3

that time. Ms. Cejas testified that the Debtor is contractually due for the July 2023 monthly mortgage payment.

In May 2024 PennyMac filed a lawsuit in the United Sates District Court for the Northern District of Alabama against Debtor, Synovus Bank and USAA Federal Savings Bank.[6] Although that case is now stayed because of the Debtor's Chapter 7 bankruptcy case, PennyMac allowed the dismissal of both banks as a result of a pro tanto settlement with each. According to Ms. Cejas's testimony, PennyMac received a total of $60,000.00 from the settlements with Synovus Bank and USAA Federal Savings Bank that was applied to the balance due on the Debtor's loan.

The Debtor filed this Chapter 7 bankruptcy case on July 9, 2024, after PennyMac filed the suit against him and the two banks in the District Court. Based on the Debtor's schedules and other documents in the main bankruptcy case, it appears that in January 2022 the Debtor acquired another home, where he currently resides, that secures another mortgage to PennyMac for approximately $280,867.00.[7] *See* BK Doc. 1, at 19. On October 4, 2024, PennyMac filed the Complaint in this adversary proceeding against the Debtor alleging that the debt owed pursuant to the note and mortgage on the Kimberly, Alabama property is nondischargeable under Bankruptcy Code § 523(a)(2)(A) based on false representations and actual fraud by the Debtor.

Ms. Cejas testified that PennyMac relied on the Debtor's statements that he would remit the insurance proceeds to PennyMac. As a result, Penny Mac suffered damages including the balance due on the loan plus attorney fees and expenses incurred from pursuing this adversary proceeding. According to her testimony the current payoff of the loan is $203,000, comprised of $181,947.96 principal; $16,741.88 interest; $830.29 escrow; $455.00 property inspections; $3,035

---

[6] Case No. 2:24-cv-00635-RDP
[7] The Debtor signed a note and mortgage dated January 6, 2022, in the original amount of $285,240.00 secured by real property in Bessemer, Alabama. BK Doc. 19.

preservations costs; and $16.00 recording costs. The current payoff is the amount due after the application of the $60,000 recovered in the District Court case. Counsel for PennyMac represented to the Court that, as provided for in the mortgage, PennyMac further seeks recovery of reasonable attorney fees for 40 hours at $350.00 per hour.

## CONCLUSIONS OF LAW

In this adversary proceeding, PennyMac has asserted that the debt is nondischargeable pursuant to Bankruptcy Code § 523(a)(2)(A) due to a false representation made by the Debtor, as well as the Debtor's actual fraud. Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
> ...
> (2) for money . . . to the extent obtained by –
> (A) false pretenses, a false representation, or actual fraud . . . [.]

11 U.S.C. § 523(a)(2)(A). According to the Eleventh Circuit Court of Appeals, in order to have a debt declared nondischargeable under § 523(a)(2)(A) a creditor must prove by a preponderance of the evidence "(1) that [the debtor] used false pretenses, or made a false representation, or committed actual fraud; (2) that [the creditor] relied on [the debtor's] conduct; (3) that [the creditor's] reliance was justified; and (4) that [the debtor] conduct caused [the creditor's] loss." *Harris v. Jayo (In re Harris)*, 3 F.4th 1339, 1344 (11th Cir. 2021) (citing *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998); *HSSM # 7 Limited Partnership v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 892 (11th Cir. 1996); *Field v.* Mans, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). In addition, each element must be proven for a plaintiff to successfully have a debt excepted from discharge under § 523(a)(2). *Bank of Fayette County v. Hampton (In re Hampton)*, 550 B.R. 773, 792 (Bankr. E.D. Ark. 2016). While all of the elements apply whether a plaintiff asserts false pretenses, false representations, or actual fraud, "the analysis

5

of the first element varies depending on the cause of action asserted." *Id.* Therefore, the Court will examine whether the Debtor made false representations or committed actual fraud before addressing the remaining elements common to each of those allegations.

**Did the debtor use false pretenses, make a false representation, or commit actual fraud?**

  A.  **False representation**

PennyMac argues that the debt owed to it should be excepted from discharge because the Debtor made a false representation. The Eleventh Circuit has noted that "a leading bankruptcy treatise explains that the false pretense and false representation prongs of § 523(a)(2)(A) each require an 'intentional wrong' – the false pretense or the false representation 'must have been knowingly and fraudulently made.'" *Harris*, 3 F.4th at 1345 (quoting 4 Collier on Bankruptcy ¶ 523.08[1][d] (16th ed. 2018)). Another court has explained "[w]hen the cause of action asserted is false representation, the first element is met by an express representation that is false at the time made." *Hampton*, 550 B.R. at 792 (citing *CNA Fin. Corp. v. Flood (In re Flood)*, 498 B.R. 806, 811 (Bankr.S.D.Ohio 2013); *Galvin v. Cole (In re Cole)*, 164 B.R. 947, 949 (Bankr.N.D.Ohio 1993)).

In *In re Dietrich*, before having surgery, the debtor knew that the hospital was not a participating provider with his insurance company; he signed an agreement that he would be responsible for paying for the hospital services and further assigned to the hospital his interest in insurance benefits. *Lehigh Valley Hosp. v. Dietrich (In re Dietrich)*, 595 B.R. 59, 62-63 (Bankr. E.D. Pa. 2018). Despite this, when he received payments from the insurance company the debtor deposited the insurance proceeds into his own account and spent them. *Id.* Among other things, the hospital sought to have the debt declared nondischargeable under § 523(a)(2)(A). *Id.* at 71. In analyzing whether the debt should be excepted from discharge, the court noted "[b]ecause a debtor

6

will rarely, if ever, admit that he intended deception, his knowledge and intent to deceive may be inferred from the totality of the surrounding facts and circumstances." *Id.* (citing *Martin v. Melendez (In re Melendez)*, 589 B.R. 260, 265-66 (Bankr. E.D. Pa. 2018); *Strominger v. Giquinto (In re Giquinto)*, 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008)). The court ultimately determined that the debt was non-dischargeable under § 523(a)(2)(A), finding the debtor intended to deceive the hospital because he spent the proceeds knowing that the insurance company would not pay the hospital directly, the explanations of benefits he received with the checks indicated they were in payment for the hospital services rendered, and he received hospital invoices matching the explanations of benefits and checks. *Dietrich*, 595 B.R. at 71-72.

In the case before this Court, the Debtor was told, and therefore knew, that the insurance money should have been sent to PennyMac. The Progressive policy listed PennyMac as loss payee. According to the testimony of Ms. Cejas, the Debtor had been informed by PennyMac that once he received the insurance proceeds he should endorse the check and forward it to PennyMac. The Debtor represented on "numerous occasions" that he would send the check to PennyMac. The Debtor could see that the check was payable to both him and to PennyMac. The Debtor was aware that the check and proceeds were not his to keep but, as in *Dietrich*, the Debtor kept the proceeds for his own use. The Debtor's intent to deceive PennyMac is evidenced by his actions. Moreover, any representation to PennyMac that he would send the check after he deposited it was unquestionably false as he no longer had the check to send. Therefore, PennyMac has established the Debtor made a false representation for purposes of § 523(a)(2)(A).

    **B.**    **Actual fraud**

As one court has explained, "'[a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent or cheat another."'" *Cinq*

7

*Music Grp. v. Kabara (In re Kabara)*, Case No. 19-66374-JWC, Adversary Proceeding No. 20-06009-JWC, 2021 WL 4267980, at *7 (Bankr. N.D. Ga. Sept. 2, 2021) (quoting *Veazey v. Sutton (In re Sutton)*, 550 B.R. 917, 922 (Bankr. N.D. Ga. 2016)). According to the United States Supreme Court:

> [T]he historical meaning of "actual fraud" provides even stronger evidence that the phrase has long encompassed the kind of conduct alleged to have occurred here: a transfer scheme designed to hinder the collection of debt. . . . "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid*. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elec., Inc. v. Ritz*, 578 U.S. 355, 360, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016). *See also Harris*, 3 F.4th at 1345.

In sum, courts have considered actual fraud to involve a deceit to cheat another, or in other words, a fraud involving moral turpitude or intentional wrong. Here, the Debtor received an insurance check payable to both him and to PennyMac, and yet he kept the proceeds of that check for himself, knowing that it was issued to pay PennyMac for the loss of its collateral. The Debtor was fully aware that he owed the loan secured by the mortgage on the now-worthless collateral, and the insurance proceeds should have been used to pay the debt. Instead, the Debtor intentionally kept the proceeds, cheating PennyMac out of money to which it was entitled pursuant to the insurance policy. The Supreme Court in *Husky* referred to a "scheme designed to hinder the collection of the debt," which is precisely what happened here. PennyMac has established that the Debtor committed actual fraud.

**Did PennyMac rely on the Debtor's conduct, and if so, was the reliance justified?**

PennyMac has established that the Debtor both made false representations and committed actual fraud with regard to the check issued by Progressive. The next question is whether PennyMac justifiably relied on the on the false representations and actual fraud.

> To constitute justifiable reliance, "[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." *In re Vann*, 67 F.3d 277, 283 (11th Cir.1995) (quotation omitted). Thus, "[a]lthough the plaintiff's reliance on the misrepresentation must be justifiable, ... this does not mean that his conduct must conform to the standard of the reasonable man." *Id.* (quotation omitted) (second alteration in original). Justifiable reliance is gauged by "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *Id.* (quotation omitted).

*Stewart Title Guar. Co. v. Roberts-Dude*, 597 Fed. App'x 615, 617 (11th Cir. 2015).

As a mortgage servicer, PennyMac is aware that upon a loss an insurance company typically sends a check to the policy holder, as is evidenced by the conversation wherein PennyMac's representative informed the Debtor that upon receipt the insurance check should be endorsed and sent to PennyMac. In addition, PennyMac sent written instructions to the Debtor as to the process he should follow. The Debtor represented to PennyMac that he would send the check and PennyMac relied on this representation. Furthermore, the reliance was justifiable as there is no evidence PennyMac had any reason to doubt the Debtor's representation. In addition, even if the Debtor had not stated he would send PennyMac the check, this Court finds justifiable reliance by PennyMac for the purposes of actual fraud. PennyMac had instructed the Debtor verbally and in writing the process he should follow once he received the insurance proceeds. There is no evidence that PennyMac should have suspected that the Debtor would keep the funds for himself and not forward them to PennyMac as he was required to do. The Court finds that PennyMac relied on the Debtor's representations that he would forward the check to PennyMac, and relied that the

9

Debtor would follow the instructions that he was given, and such reliance was justified to satisfy § 523(a)(2)(A).

**Did the Debtor's conduct cause PennyMac's loss?**

As one court has noted, "[a] plaintiff must establish a causal link between the debtor's misrepresentation and the resulting loss sustained by the plaintiff." *Barnett v. Osborne (In re Osborne)*, 455 B.R. 247, 252 (Bankr. M.D. Fla. 2010) (Briskman, J.) (citing *Lightner v. Lohn*, 274 B.R. 545, 550 (M.D. Fla. 2002)). This element is perhaps the most easily satisfied out of all the requirements of § 523(a)(2)(A). Because the Debtor received the Progressive check and deposited it into his own account instead of forwarding it to PennyMac as he was required, PennyMac did not receive the insurance funds to which it was entitled. If the Debtor had complied with his obligation then PennyMac would have received the money to cover its loss. This Court finds that PennyMac has established that the Debtor's conduct directly caused PennyMac's loss. In addition, the Court finds that PennyMac is entitled to reasonable attorney fees and costs in the amount of $14,000, comprised of 40 hours of attorney time spent on this case at the cost of $350 per hour.

## CONCLUSION

The evidence shows that the Debtor received a check from Progressive Insurance made jointly payable to himself and PennyMac for the destruction of his home by fire. Further, it is undisputed that the Debtor endorsed the check and deposited it into his account instead of forwarding the check to PennyMac as he was required to do. The Debtor both falsely represented that he would send the check to PennyMac and committed actual fraud by keeping money to which he was not entitled. PennyMac justifiably relied on its belief that the Debtor would send the check, and as a result of the Debtor's actions, PennyMac suffered the loss of the insurance proceeds meant to cover the loss of its collateral. Therefore, the debt owed by the Debtor to PennyMac in the total

10

amount of $217,000, comprised of the current loan payoff in the amount of $203,000 and attorney fees in the amount of $14,000, is due to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). A separate order and judgment consistent with this Memorandum Opinion shall be entered.

Dated: December 18, 2025　　　　　　　　/s/ Tamara O. Mitchell  
　　　　　　　　　　　　　　　　　　　　TAMARA O. MITCHELL  
　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge

TOM/dgm